Filed 10/29/20  P. v. Mitchell CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TARON MITCHELL,<br><br>    Defendant and Appellant. | F076674<br><br>(Super. Ct. No. MF012495A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Robert F. Kane, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# **INTRODUCTION**

Appellant/defendant Taron Mitchell assaulted his girlfriend over the course of two days, and had a history of committing prior acts of domestic violence against her. Afterwards, he tried to dissuade her from cooperating with the district attorney's office in prosecuting the case. He was convicted of three counts of willful infliction of corporal injury (Pen. Code, § 273.5, subd. (a));[1] two counts of criminal threats (§ 422); violating a restraining order (§ 273.6, subd. (d)); dissuading a witness (§ 136.1, subd. (b)(2)); and misdemeanor falsely identifying himself to an officer (§ 148.9, subd. (a)). He was sentenced to nine years in prison.

On appeal, defendant argues the court should have granted his motion to suppress evidence seized pursuant to a search warrant issued to Facebook for information about an account for "Korajus Green," which he used to send messages to the victim after the assaults. Defendant contends the warrant was overbroad and failed to define the evidence sought with particularity because it demanded the seizure of all information about the "Green" account. Defendant argues the warrant should have been limited to the actual messages exchanged between defendant (under his alias) and the victim, and all the evidence obtained from the Facebook warrant should have been excluded.

Defendant further argues the court abused its discretion when it denied his request for the full amount of funds requested to retain his first choice of an expert to examine the evidence obtained from the Facebook warrant. Finally, defendant argues the court improperly imposed an upper term and consecutive sentences. We will affirm.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

# FACTS

As of 2017, defendant and K.H. had been together for four years and were the parents of two children, who were aged one and three years old. K.H. was 23 years old.[2]

## Prior domestic violence incidents at the Mojave apartment in 2016[3]

In early July 2016, defendant, K.H., and the children lived in an apartment in Mojave. Defendant accused her of cheating on him. He produced a large black firearm, held it against her head, and put it in her mouth. Defendant hit her right thigh with the gun's stock, and she suffered pain and bruises. K.H. said defendant hit her in the head with a closed fist three times.

On July 20, 2016, defendant again accused K.H. of cheating on him. Defendant pushed her and twisted her hand.

Later on July 20, 2016, Kern County Sheriff's Deputy Andrew Piuser received a dispatch to respond to the apartment because a woman wanted to pick up some property. Piuser met K.H., who had scratches on her hands and a red mark on her forehead. K.H. said there had been an altercation with defendant, and he pushed a plastic cap from a water bottle into her forehead that left the mark.

K.H. also told Piuser about the incident from July 5, 2016, when defendant put the gun to her head and in her mouth, and repeatedly punched her. K.H. said she suffered from headaches after that incident and went to the hospital for treatment, and showed her discharge papers to the deputy.

After taking the report from K.H., Piuser arrested defendant, who was still at the scene. Piuser seized a .22-caliber Marlin rifle that was 21 inches long. It was a "long rifle" that had been shortened. Defendant had a magazine for the firearm in his pocket.

---

[2]     According to the probation report, defendant was 23 years old.

[3]     Defendant's prior acts of domestic violence were introduced pursuant to Evidence Code section 1109.

K.H. testified that she did not cooperate with the prosecution for the July 2016 incidents. She felt defendant was not a bad person, and he just needed help instead of being sent to jail.

**Prior incident at the hospital in 2016**

On or about October 7, 2016, defendant was a patient at Antelope Valley Hospital and hooked to an intravenous line. K.H. and the children were with him in his hospital room. K.H. asked defendant for the car keys so she could retrieve the diaper bag. Defendant refused to give her the keys, and prevented one of the two children from leaving the room. K.H. was frightened and asked the hospital staff for help to get the child out of the room. K.H. testified she could not remember very much about the incident because she was "coming off" drugs that day.

The nursing staff was concerned about the family's safety and advised Sara Morgan, a hospital social worker, about the situation. Morgan learned that K.H. and the two children had spent the previous night in defendant's room without food, clothing, or diapers. Morgan went to defendant's room and found him alone with the older child. Morgan asked where K.H. and the younger child were. Defendant refused to answer.

Morgan found K.H. and the younger child in the emergency department, where K.H. was asking the hospital's staff for help.

Based on the situation, Morgan believed the child in defendant's room might be in danger, and instructed a security officer to remove the child. Morgan reunited K.H. with the child, and then escorted K.H. and the children to a locked office for their safety.

Morgan testified that K.H. and the children were unkempt. Staff members changed and cleaned the children with supplies from the pediatric department, and gave everyone something to eat.

K.H. was terrified and shaking, and reluctant to share details about what happened because she was "genuinely frightened" and "fear[ed] for her life." She told Morgan that defendant had physically abused her by hitting her arms, and Morgan observed bruises

4.

down her arms. K.H. said defendant would "drive her to the desert and beat her and threaten to kill her with a gun in front of the children, and would later say that he had changed his mind" and drive her back home. K.H. said that each time she tried to leave defendant, he threatened to kill her foster parents.

Morgan testified that K.H. also told her about an incident where she was sexually intimate with defendant, and he forced methamphetamine into her rectum. Defendant said he would have to take her to the hospital, and she would test positive for drugs and lose custody of the children.

Bridgett Amis, a registered nurse who regularly conducted forensic examinations in domestic violence cases, met with K.H. and the children. K.H. reported that defendant assaulted her in his hospital room. Defendant grabbed her by the forehead, said she had to stay at the hospital, and threatened to hit her. Amis observed injuries on K.H.'s body, including multiple bruises on the side of her head, cheekbone, and both arms. K.H. complained of pain and tenderness on her back. K.H. said defendant inflicted all of the injuries.

K.H. testified a criminal case was filed against defendant based on the hospital incident, but she again refused to cooperate because she felt defendant was not a bad person and just needed help. However, K.H. was ultimately forced to appear in court and defendant was held in custody.

After defendant was released, K.H. begged him to return and lied that she didn't cooperate. They got back together and lived in Mojave. Defendant later found out that she appeared in court, and got mad at her. They were standing on the side of the road when he learned she lied to him, and defendant pushed her, slapped her face and arm, punched her in the eye, and ripped out her nose ring and earrings.

K.H. testified that even after this incident, she still begged defendant to stay with her because K.H. and the children loved him. They lived together in a motel so her family didn't see her injuries.

5.

**Stipulations about prior cases**

In the instant trial, the jury was advised of the stipulation that on November 9, 2016, the superior court in Mojave issued a modified protective order that prohibited defendant from harassing, striking, threatening, assaulting, following, stalking, or molesting K.H., or destroying or damaging her personal property. (§136.2, subd. (g).)[4]

The jury was also advised of the stipulation that on March 15, 2017, defendant was convicted of violating a domestic violence restraining order that was imposed by Los Angeles County Superior Court (§273.6, subd. (a)), in the case based on the hospital incident.[5]

## THE CURRENT CHARGES

The charges and convictions in the instant case are based on a series of domestic violence incidents in April 2017, and defendant's subsequent efforts to dissuade K.H. from cooperating with the prosecution.[6]

---

[4]    According to the People's motion in limine and the probation report, on September 27, 2016, defendant was convicted in Kern County Superior Court in Mojave, case No. MF012186A, of violating section 33215, possession of a short-barreled rifle or shotgun, and placed on probation for three years. The protective order was issued as part of that case.

[5]    According to the People's motion in limine and probation report, the district attorney's office filed domestic violence charges against defendant based on the hospital incident. K.H. appeared in court, but was not cooperative. As a result, on March 15, 2017, defendant pleaded guilty in Los Angeles County Superior Court in Lancaster, case No. 696601, to a lesser charge of misdemeanor violation of a restraining order (§ 273.6, subd. (a)), and he was placed on probation for three years.

[6]    Prior to the instant trial, K.H. invoked her privilege not to incriminate herself. The jury was advised pursuant to the parties' stipulation that K.H. was given an immunity agreement where the People agreed not to use any of her trial testimony against her in a criminal proceeding.

When K.H. testified, she claimed not to remember much about the April 2017 incidents, that she lied when she reported the assaults so defendant would be arrested, insisted the incidents didn't happen, and admitted she did not want to appear at trial. However, she also admitted the photographs of bruises on her body were from injuries inflicted by defendant. Based on K.H.'s testimony, the court granted the People's motion to admit portions of her prior testimony from the preliminary hearing.

6.

**First incident at the sister's apartment**

On April 26, 2017, K.H. and defendant were staying at the apartment of K.H.'s sister, J.H., in Kern County.[7] K.H. testified defendant arrived at the apartment and appeared to be high on drugs. Defendant claimed a friend told him something about K.H. Defendant took K.H.'s cellphone and broke it. K.H. was lying on the bed and defendant threw ice water on her. She tried to get out of bed and he pushed her down. Defendant hit her in the ribs and the blow left a mark on her body.

Defendant again pushed K.H. back onto the bed and threw more water on her. Defendant picked up a fork and threatened to "'poke'" and "'stab'" K.H. if she failed to correctly answer his questions. K.H. answered his questions, but he did not believe her. Defendant stabbed her with the fork. K.H. raised her hands to protect herself and defendant stabbed her hand. Defendant said he wasn't playing and asked more questions. He said he didn't believe her, and threatened to put the fork through her cheek and forehead.

K.H. again tried to get out of bed and defendant told her not to. She tried to cover herself with the blanket, but defendant stabbed her in the back of the head with the fork. One of the children walked into the bedroom and the assault ended.

**Second incident at the sister's apartment**

On the morning of April 27, 2017, defendant, K.H. and the children were still at her sister's apartment. K.H. woke up and tried to take her child to the bathroom. Defendant pushed her back onto the bed. He again stood over her and accused her of cheating on him. K.H. rolled herself into a ball to protect herself, but defendant punched her in the face. Defendant tried to hit her, but she raised her hand to block him and he hit her hand. Defendant threw another punch, hit her arm, and left bruises on her body.

---

**7**     We will refer to K.H.'s sister as J.H. for ease of reference. No disrespect is intended.

Defendant pushed her around and grabbed her neck. He accused her of being a liar and cheater. He told K.H. to stand by the window so that he could knock her out, and then she'd fall out of the window and it would be her fault. K.H. was scared, but walked toward the window because she "just didn't care anymore[]" and felt that she would be saved from "everything else[]" if she fell out of the window.

As K.H. stood in front of the window, defendant put both hands around her neck, choked her, and told her he was just going to knock her out.

**K.H. reports the incidents**

J.H. testified she had been in the apartment, but was asleep when these incidents occurred in April 2017. J.H. testified that after defendant left the apartment, K.H. told her that defendant tried to stab her with the fork, and showed her the injuries to her hand. K.H. also revealed that defendant told her to stand in front of the window and he was going to kick her through it. J.H. had previously seen injuries on K.H.'s body, and K.H. had told her about the prior incident where defendant placed the gun in her mouth. J.H. later found the bent fork under the bed used by K.H. and defendant. The fork was presented as evidence at trial.

Later on April 27, 2017, J.H. drove K.H. to the sheriff's substation in Mojave, and K.H. reported the assaults that occurred at J.H.'s apartment.

J.H. testified that on April 28, 2017, she was working at McDonald's. J.H.'s husband and defendant entered the building together. J.H. testified defendant pointed a gun at her husband, her husband pulled out a knife and pointed it at defendant, and she called 911 because she was scared.

**K.H. reports defendant's Facebook messages**

After K.H. reported the April 2017 incidents, she lived at a shelter in Ridgecrest with the children. Defendant was not immediately taken into custody. K.H. testified she contacted defendant through Facebook and they communicated with each other, and also used video chatting. K.H. testified they talked about the children, their relationship, and

8.

how he hit her. K.H. sent photographs of her bruises to defendant. Defendant repeatedly apologized for hitting her. Defendant also asked for her phone number and location, but she refused to give that information. K.H. testified she liked the help she received at the shelter, but she still wanted to live with defendant again.

On May 23, 2017, Deputy Bays conducted a follow-up interview with K.H. She was tearful and upset, and said she was afraid of defendant. Deputy Bays obtained screenshots from K.H.'s cellphone that showed her exchanges with a Facebook account that was under the name of "Korajus Green." K.H. said the Facebook messages were sent by defendant under a false name.

**Defendant's arrest**

At 10:52 a.m. on June 12, 2017, Deputy Chaidez was on patrol in Kern County when he conducted a traffic stop on a vehicle for performing for an illegal U-turn. Defendant was a passenger in the car. Chaidez asked defendant for identification. Defendant falsely said his name was J.L. Chaidez knew J.L., however, and realized defendant was lying. Defendant then provided a variety of ages and birthdates. He was arrested for giving a false name and taken to the Mojave substation. When he was booked at the jail, he continued to give false names until another deputy recognized and identified him. Defendant finally gave his true name. A cellphone was seized from him.[8]

---

[8] On June 14, 2017, the court served defendant with a domestic violence protective order (§ 136.2) prohibiting him from harassing, striking, stalking, or threatening K.H.; having any personal, electronic, telephonic, or written contact with her; having any contact with her through a third party; and not come within 250 yards of her. The court further ordered defendant not to prevent or attempt to prevent or dissuade any victim or witness from appearing at a hearing, making a report to law enforcement, or testifying.

On September 15, 2017, K.H. appeared at a pretrial hearing and requested modification of the existing restraining order so she could have contact with defendant while he was in jail. The prosecutor objected and requested the court defer ruling on the request until after the trial. The prosecutor explained that a prior domestic violence case against defendant was dismissed because defendant dissuaded the victim from cooperating, and the current charges contained a dissuasion count. The prosecutor stated defendant had been calling the victim from jail, and now she wanted to drop the charges and remove the protective order.

**K.H.'s letters**

After defendant was arrested, K.H. wrote letters to him in jail. On September 17, 2017, K.H. wrote that she was sorry for lying about everything and pretending to be a victim, she lied about the fork incident, she learned her lesson, and she wanted to be with him again. K.H. testified she wrote the letters because she wanted to get him out of jail. K.H. admitted she wrote similar letters to defendant when he was taken into custody in the prior domestic violence cases.

**Cellphone/Facebook evidence**

After defendant was arrested, a search warrant was obtained for the contents of his cellphone. An evidence technician trained to use the Cellebrite program extracted data from defendant's cellphone that generated a PDF report that was over 3,400 pages.

Deputy Walden testified that based on the screenshots obtained from K.H.'s cellphone, a search warrant was issued for Facebook to produce information about the account under the name of "Korajus Green."[9] In response to the warrant, Deputy Walden received discovery from Facebook consisting of a PDF report for the "Green" account that consisted of 1,700 to 1,800 pages.

Deputy Walden testified he compared the Facebook information with the report generated by the Cellebrite search of defendant's cellphone. He determined there was an account on defendant's cellphone in the name of "Korajus Green." Defendant's cellphone had multiple alerts from Facebook to "Korajus Green" that he received messages from K.H. The Facebook account for "Korajus Green" had sent multiple "selfies" of defendant to K.H.

---

The court granted K.H.'s request, removed the stay-away order, allowed defendant to have contact with her, and ordered K.H. to appear for trial.

**9** We will address the search warrant and the court's denial of defendant's suppression motion below, and in part I. of the Discussion.

The screenshots that Deputy Bays received from K.H.'s cellphone of the Facebook messages sent to her by "Korajus Green" corresponded with Facebook records of "Green's" account received pursuant to the warrant. There were images in the Cellebrite search report of defendant's cellphone that corresponded to images contained in the Facebook evidence for "Korajus Green," and the screenshots of messages on K.H.'s device that were sent by "Green."

**The Facebook messages**

The prosecution introduced evidence about the following Facebook messages between the "Korajus Green" account and K.H.

On May 25, 2017, K.H. sent a Facebook message to "Korajus Green" that was found on defendant's cellphone. K.H.'s message said, "'Yeah, I'm the only one you hit.'" "Green" responded: "'Be proud.'"

"Green" sent several messages to K.H. that he needed her and called her endearing names. "Green" also sent a message to K.H. about how she filed a police report. "Green" told K.H. that she had the police looking for him and she was trying to ruin his life.

There were multiple messages between K.H. and "Green" where they discussed prior acts of domestic violence, and "Green" apologized.

There were also messages where "Green" asked K.H. for her phone number and her location, and K.H. refused to give the information.

**Defendant's phone calls from jail**

After defendant was arrested, he remained in custody and called K.H. several times from jail. At trial, K.H. testified she asked defendant to call her from jail because she missed him and wanted to be with him.

The recorded calls between defendant and K.H. occurred in September 2017, just before the scheduled start of trial at the end of that month, and were played for the jury.

In some of the calls, defendant's voice identified himself as "Hakim" when he placed the call, which was the name of defendant's cellmate.

On September 10, 2017, defendant told K.H. that if she had to go to court, they would cross-examine her and she needed to "go in a different direction than what you went before[,]" and say he didn't do it or she had a bad dream.

On September 12, 2017, defendant asked K.H. when she was going to the courthouse, and said it would be good if she said something so he could get an early dismissal. K.H. told him to shut up because he was talking too much.

On September 14, 2017, defendant told K.H., "I know you dropped it and everything, but they told me that [the] DA might still pursue … it." Defendant added, "I think that it'd be best if you just um—call to talk to the DA[.]" The conversation continued:

> "[Defendant]: … [Y]ou remember how it went the last time, right?
>
> "[K.H.]: Yeah.
>
> "[Defendant]: How you had to say that you—you know what I mean?
>
> "[K.H.]: Yeah.
>
> "[Defendant]: That you lied, basically.
>
> "[K.H.]: Yeah."

In the same call, defendant told K.H., "Just tell 'em that you did it out of spite or whatever … you did it because." K.H. interrupted and said, "Stop saying that 'cause you already know … you're making them feel like you're telling me to do it. So, I already know what I'm doing."

Also on September 14, 2017, defendant told K.H. to tell the district attorney that she testified at the preliminary hearing because she was homeless. K.H. said there was a

hearing on the restraining order the next day. Defendant told her to call and say she wasn't in Bakersfield.

On September 15, 2017, defendant explained to K.H. that if she didn't show up for trial, they would delay it and send a body attachment for her that was like a warrant. Defendant told K.H. it wasn't as bad as it seemed. K.H. asked whether to take their child out of school that day. Defendant told her to take the child completely out of school. K.H. told defendant, "We gotta seriously find a way where all this shit just stops like I—I really feel like just showing up to court and just saying you know what, like I lied. I hit him first and that's what happened." Defendant didn't want her to say that, and instead told her to say he never hit her.

On September 25, 2017, defendant's trial was scheduled to begin, but K.H. did not appear in court.[10] Defendant called K.H. later that day, and K.H. asked what happened. Defendant said "he" was mad when "he" didn't see K.H. in court (referring to someone else) and put out a body attachment for her. K.H. complained that she was supposed to go to a job interview that day. Defendant warned that she could go to jail if they caught her.

**Domestic violence expert**

Jeri Darr, a social worker, testified as an expert on the cycle of violence in domestic violence cases: the tension-building phase, the explosive stage, and the honeymoon or de-escalation phase. Accusations of infidelity are common in domestic violence relationships. Alcohol and drugs play a factor "[a]ll the time[]" and are disinhibitors and often used as an excuse, although the perpetrators will still commit abuse without abusing drugs or alcohol.

---

**10** When K.H. failed to appear, the court issued a body attachment and continued the trial to October 3, 2017.

Domestic violence incidents are often unreported by victims. Someone other than the victim often reports the incidents to law enforcement. A victim may be initially forthcoming about the incident in the first 48 to 72 hours. However, the victim may be influenced by pressure from family and friends, the abuser's telephone calls from the jail, and the financial pressures from the absence of the domestic partner, which will influence the victim's decision about whether to cooperate with the prosecution. A victim may not trust the criminal justice system or want to stay in a chaotic shelter. The abuser will often assure the victim of his or her love, or even threaten the victim if he/she cooperates. Someone who grows up in a violent situation in his/her own family may believe it is a common part of any relationship.

## DEFENSE EVIDENCE

Victor VeVea testified as a defense expert about the information obtained from defendant's cellphone and the Facebook search warrant. VeVea had a bachelor's degree in math and computer science, a law degree, and previously had been certified as a computer engineer. He had previously reviewed Cellebrite extraction reports, but he did not use the program and did not have specialized training on how it worked.

VeVea testified there were discrepancies on some of the data extracted by the Cellebrite search of defendant's cellphone, that said the messages were created in the year "2097."

VeVea testified custodial inmates were not allowed to use cellphones or access social media. However, there were Facebook chats dated June 12, 2017, when defendant was taken into custody, including one sent by "T Raw Woah[]" that said, "'I'm in jail. I'll call tonight.'" The data from three Facebook chat logs showed they were modified on August 31, 2017, when defendant was in custody. When something is modified or edited, that meant it was changed on that date. There could have been errors from copying the files that changed the modification dates.

VeVea conceded that anyone with a password could modify a Facebook account, and there was no way to determine how many people had access to defendant's password. VeVea reviewed the Facebook evidence and found examples where someone else was identified as writing messages from the account. Most of the modifications on August 31, 2017, were made within seconds of each other. VeVea agreed that it was physically impossible to type the contents of all the chat boxes in one minute, and conceded the computer likely made the modifications, but he didn't know for sure.

VeVea testified he briefly reviewed the evidence obtained from the Cellebrite search of defendant's cellphone, and found photographs of defendant and K.H.[11]

## REBUTTAL

Deputy Sean Mountjoy testified he had been trained on how to use the Cellebrite cellphone extraction program. Mountjoy had not reviewed the evidence in this case, and generally explained that some extractions could modify files. The contents of the file would not be modified, and instead the file was moved somewhere else or opened as a different kind of file. It was impossible for someone to modify the PDF report generated by Cellebrite without using specialized programs.

## PROCEDURAL BACKGROUND

On July 7, 2017, the information was filed that charged defendant with the following offenses:

Count 1: Willful infliction of corporal injury resulting in a traumatic condition to the mother of his child on April 26, 2017 (§ 273.5, subd. (a));

Count 2: Assault with a deadly weapon, a fork, on April 26, 2017 (§ 245, subd. (a)(1));

Count 3: Willful infliction of corporal injury on April 27, 2017 (§ 273.5, subd. (a));

---

[11] In part II. of the Discussion, we will address defendant's contentions that the court abused its discretion when it limited the defense request for funds for VeVea to review the electronic evidence.

15.

Count 4:  Violating a restraining order on or about and between April 26 and 27, 2017, within seven years of a prior conviction (§ 273.6, subd. (d));

Count 5:  Willful infliction of corporal injury on or about and between January 1 and April 26, 2017 (§ 273.5, subd. (a));

Count 6:  Dissuading a witness with force or violence on or about and between April 27 to June 12, 2017 (§ 136.1, subd. (c)(1)); and

Counts 7 and 8:  Criminal threats on, respectfully, April 26 and 27, 2017 (§ 422).

As to counts 1 and 2, it was further alleged defendant personally used a deadly weapon, a fork (§ 12022, subd. (b)(1)).

**Trial**

On October 12, 2017, defendant's trial began with motions in limine.

On October 12, 2017, the court granted the People's request to amend the information to add count 9, misdemeanor falsely identifying himself to a police officer on June 12, 2017 (§ 148.9, subd. (a)).

On October 17, 2017, the parties gave their opening statements and the People began the presentation of evidence.  On October 23, 2017, the People rested.

On October 24, 2017, the court granted the People's request to file an amended information to modify count 6 to instead allege felony dissuading a witness in violation of section 136.1, subdivision (b)(2), on or about and between May 3 to June 12, 2017. The court granted the People's motion to dismiss count 2 and the attached enhancement.

**Verdict and sentencing**

On October 25, 2017, the jury found defendant guilty of count 1, and counts 3–9, and found the deadly weapon enhancement true for count 1.

On November 28, 2017, defendant was sentenced to an aggregate term of nine years in prison.[12]

## THE SEARCH WARRANT

Defendant's primary issue on appeal is that the court should have granted his motion to suppress the evidence obtained from the search warrant served on Facebook for information from the "Korajus Green" account. As we will explain in part I. of the Discussion, defendant argues the warrant was overbroad and failed to define the evidence sought with particularity because it demanded all information about the "Green" account, and it should have been limited to copies of the messages between "Green" and K.H.

We will review the affidavit, the search warrant, and the court's denial of the suppression motion, and address defendant's contentions in part I. of the Discussion.

### The search warrant affidavit

On or about August 23, 2017, Deputy Walden of the Kern County Sheriff's Department filed an affidavit and declaration in support of a request for a search warrant to be served on Facebook, to obtain information and the contents of the account with the screen name "Korajus Green" from January 1, 2017, up to the date the search warrant would be issued.

In the affidavit and statement of probable cause, Walden described in detail the domestic violence incidents when defendant assaulted K.H. on April 26 and 27, 2017, consistent with the evidence introduced at trial. Walden declared that K.H. reported the assaults to law enforcement on April 27, 2017, but defendant was not located or arrested at the time.

Deputy Walden's affidavit explained the connection between defendant and a Facebook account under the name of "Korajus Green."

---

[12] In part III. of the Discussion, we will address defendant's contentions that the court improperly abused its discretion when it imposed upper and consecutive terms without stating reasons.

*"As of 05/23/2017 [defendant] still had not been located when [K.H.] reported to Deputy Bays [defendant], via a Facebook account with the screen name Korajus Green, had been contacting her for several weeks via Facebook messenger. [K.H.] was certain this was [defendant's] account because, not only was the conversation specific to their relationship but he sent at least one picture of himself. This communication is a violation of a Los Angeles County protection order (#6AN06966) which prohibits … [defendant] from contacting [K.H.] and is also a violation of [section] 136.1.*

*"[K.H.] sent screenshots of some of the messages to Deputy Bays. I was unable to determine the exact dates and times of the screenshots. The screenshots appear to be threatening [K.H.] and refer to her making reports and working with the police*. He makes statements such as:

"'I'm chip u... [¶] I[]aint playing no more [¶] On [daughter's name] life u been a rat'

"'Bitch die... [¶] U working with the police'

"'This is y u get beat up [¶] Kus u play with the wrong person [¶] Skr8 [¶] Up [¶] U been a rat' [¶] … [¶]

"When [K.H.] confirms he is talking about him beating her up in the messages he replies: [¶] 'Yeap Again Again Again Again'" (Italics added.)

Walden further declared:

"Based on my training and experience, I am aware some people will document all aspects of their life on social media sights such as Facebook. *I believe, based on the limited number of messages I saw from the account used by [defendant], he used the account to contact [K.H.] and attempt to intimidate her. I further believe the above mentioned requested records will show numerous messages, pictures, and various deleted content which will assist in corroborating the story of either the victim ([K.H.]) or the suspect ([defendant]) in this case.*" (Italics added.)

Based on the facts declared in the affidavit, Walden requested the court issue a search warrant to Facebook for the account with the "screen name" of "Korajus Green" that was "*believed to belong to* [*defendant*,]" and produce "*any item or … any evidence that tends to show a felony has been committed, or tends to show that a particular person*

*has committed a felony*[,]" from January 1, 2017, up to the date the warrant was issued. (Italics added.)

Walden further requested the court order Facebook not to disclose the existence of the warrant to the target/party because it would lead to an adverse result that may endanger the life or physical safety of an individual or lead to flight from prosecution, the destruction or tampering of evidence, intimidation of witnesses, or otherwise seriously jeopardize the investigation or delay trial.

**The search warrant**

On August 27, 2017, the superior court signed and issued the warrant as requested by Walden.

The search warrant commanded Facebook to search for "[t]he following information from the listed Facebook Inc, Instagram LLC account(s) *believed to belong to [defendant] living in Mojave, California*" with the screen name "Korajus Green*,*" and listed the user name and number of the account. (Italics added.) The warrant sought:

> "1.) … **SUBSCRIBER INFORMATION**: Provide affiant with basic subscriber information including the customer's first and last name, gender, date of birth, age, county, city, postal code, region, occupation, e-mail address, user name, associated telephone number, signup I.P. address with date/time of account creation for the user, deletion date if applicable.
>
> "2.) … **I.P. Logs**: Provide affiant with logs showing log-in I.P. activity including I.P. addresses and date/time stamps for account accesses and any photographs and/or messages posted.
>
> "3.) … **STORED USER FILES**: Provide affiant with stored user files including photos, photo comments, videos, blogs and the identities of their friends, the contents of private messages in the user's inbox, sent mail, saved mail, and trash folders, contents of the user[']s address book, contents of any bulletins contents of private journals or blogs, classified advertisements, messages posted on Facebook forums or in Facebook Groups, and calendar contents for the dates of **1/01/17 until the date this warrant is processed**.

19.

"4.) … **OFFLINE DUPLICATE**: Provide affiant with an offline copy of the above mentioned profile in a web archived format."[13]

The warrant further stated:

"As required by … § 1546.1[, subdivision] (d); any information obtained through the execution of this warrant that is unrelated to the objective of the warrant shall be sealed and shall not be subject [to] further review, use, or disclosure absent an order from the Court.  [¶]  If no evidence of criminal activity is discovered relating to the seized property or associated peripherals, the system will be returned promptly."

Finally, Facebook was ordered not to notify the subscriber or any other person of the existence or content of the warrant or the investigation, unless and until otherwise ordered by the court, for 90 days.

**Evidence disclosed by Facebook**

As set forth in the factual statement, Facebook complied with the search warrant and disclosed over 1,700 pages of information from the "Korajus Green" account to the district attorney's office, and the evidence was given to defense counsel.

On October 12, 2017, the People filed a pretrial motion in limine to admit certain evidence from the Facebook warrant that constituted admissions by defendant. Defendant initially filed a motion in limine to exclude such evidence, based on the mistaken belief that the evidence was obtained without a warrant.  Defense counsel later withdrew the motion without prejudice to filing a suppression motion.

**Defendant's suppression motion**

On October 24, 2017, defendant filed a motion to suppress all evidence obtained "as a result of search and seizure violations that occurred during the search of

---

**13**     As we will discuss in part I. of the Discussion, defendant asserts the warrant was overbroad and lacked probable cause to demand the information defined in paragraphs 2 and 3.

20.

*Defendant's Facebook account*[]" because the warrant was overbroad and not narrowly drawn. (Italics added.)[14]

Defendant argued that the People obtained the Facebook records "under the guise" that the requested material would assist in corroborating the story of either defendant or K.H. Defendant complained the prosecution did not limit the seizure to messages between defendant and K.H. Instead, the warrant demanded the wholesale seizure and search of all of defendant's personal information stored in that Facebook account.

Defendant further argued the suppression motion should be granted for all evidence obtained from the Facebook warrant because the People used a "general warrant" that was "not narrowed by time frame, subject matter, or types of documents for which arguably there is probable cause[]" and there was no good faith exception to the search and seizure.

**Hearing on defendant's motion**

On October 24, 2017, after the People rested its case, the court conducted a hearing outside the jury's presence on defendant's suppression motion. Defense counsel submitted the matter on the pleadings.

The People did not file a written opposition to the suppression motion. At the hearing, however, the prosecutor argued the warrant was not overbroad simply because it resulted in the disclosure of a large amount of evidence that fell within the parameters of the warrant. The warrant was based on the private communications between K.H. and someone she believed was defendant, who used the "Green" account, and showed defendant violated an existing protective order. It was reasonable to obtain the identifying electronic information from the Facebook account to connect defendant to the messages sent from the "Green" account.

---

[14] The suppression motion repeatedly stated the warrant sought evidence from "*Defendant's*" Facebook account, and apparently did not contest the allegations in Walden's declaration that defendant used "Green's" account to contact K.H. (Italics added.)

The prosecutor further argued that if Facebook disclosed additional information that might have been beyond the scope of the warrant, the district attorney's office had not relied on or introduced any evidence that was not relevant to the People's case.

**The trial court's ruling**

The trial court denied the motion to suppress and held the warrant was not overbroad:

> "The warrant as presented and as attached to the motion is to Facebook for records that the evidence in this trial has now shown a Facebook account that belonged to [defendant] going by the screen name of Korajus Green. Some of that evidence has already been introduced or presented to the jury.

> "The … affidavit that is a declaration in support of the issuance of the warrant set forth the facts that the People have summarized and sets forth the relationship between the defendant, Mr. Mitchell, the victim in this case, [K.H.], and that the communications were to some extent through Facebook. The information requested from Facebook had to do with the account of Korajus Green, which was believed to be the defendant, Mr. Mitchell's, account and requested subscriber information, the IP logs, the stored user files, and an offline duplicate of this be provided.

> "The Court recognizes that warrants are investigatory for search, investigatory in nature, and the Court believes that adequate probable cause has been established, at least for the investigative phase for this information that was requested. I think there are some issues that we are involved in when this information is requested regarding whether it's overbroad or not, but the Court notes that *nothing that would fall into an overbroad category; that is, it's unrelated to this crime, has been used in any fashion, whether to identify other suspects or crimes or to lead to other information*.

> "*The information that has been presented in this case appears to be in line with the intent of the search warrant to obtain information that ties in the threats [by] the defendant that were made to the victim*—or statements, I should say, at this point, the alleged threats to the victims. And I don't see anything overbroad about this particular warrant.

> "At best, I could indicate that there—and the Court notes that the request included a limitation on dates for stored data from January 1st of '17, which matches up with what the officer had at the time of the request.

22.

And so with the information available to law enforcement, the Court does not find that this warrant is overbroad in any fashion based upon the information that was presented to the deputy seeking the warrant. He was requesting the account, the information related to the account that would show a connection between the defendant and the victim and communication, and limited that request to the time period that was involved in this particular case.

"I don't know how else the officer could have limited that in any practical fashion, at least for investigatory purposes, and since none of the complained of overbroad information has been used by the People pursuing the inquiry any further. So with that, the motion to suppress under [section] 1538.5 as an in limine motion is denied .…"  (Italics added.)

## DISCUSSION

### I.    The Facebook search warrant

Defendant raises several issues regarding the trial court's denial of his motion to suppress the evidence obtained from the Facebook search warrant for the "Korajus Green" account. Defendant contends his suppression motion should have been granted because the warrant was overbroad, it failed to describe the information sought with particularity, and the warrant was not supported by the affidavit.

Defendant acknowledges the affidavit stated probable cause to seize the Facebook messages between K.H. and defendant, who used the account for "Korajus Green." However, defendant argues the scope of the warrant should have been limited to seizing the actual messages between "Green" and K.H., consistent with the screenshots that K.H. had already given to law enforcement.

Defendant complains that instead of limiting the scope of the warrant in this manner, Walden's affidavit "broadly request[ed] all data" from the "Korajus Green" account "without limitation" that went beyond the messages between "Green" and K.H., and sought "unspecified private information from Facebook be provided to law enforcement[]" so that the warrant constituted an unconstitutional general warrant. Defendant further argues Walden's affidavit failed to explain "why wholesale seizure of

23.

all of [defendant's] Facebook data since January 1, 2017 [was] necessary to obtain the one part for which there [was] probable cause, [defendant's] emails with [K.H.]."

Defendant contends that since the warrant was overbroad and failed to describe the evidence sought with particularity, all of the Facebook evidence should have been suppressed, including the actual messages between "Green" and K.H. Defendant argues the trial court's failure to grant the suppression motion and exclude all of the Facebook evidence was prejudicial and requires the reversal of count 6, dissuading a witness, because that charge was exclusively based on the Facebook messages that defendant sent to K.H. using "Green's" account.

In making these arguments, defendant cites to the concerns expressed in *Riley v. California* (2014) 573 U.S. 373 (*Riley*), about the privacy violations that occur through warrantless searches of electronic devices. In discussing these privacy concerns, *Riley* held that a suspect's smartphone could not be subject to a warrantless search incident to an arrest, and that officers must generally secure a warrant before conducting a search of an electronic device. (*Id*. at p. 386.)

In contrast to *Riley*, however, it is undisputed that a search warrant was obtained in this case that resulted in the production of the Facebook evidence, and the warrant was based on Walden's affidavit. In this situation, "when … the police do obtain a warrant, that warrant is presumed valid. 'Thus if the defendant attempts to quash a search warrant, as [the] defendant here seeks to do, the burden rests on him.' [Citation.] A defendant claiming that the warrant or supporting affidavit is inaccurate or incomplete bears the burden of alleging and then proving the errors or omissions." (*People v. Amador* (2000) 24 Cal.4th 387, 393.)

"In reviewing a search conducted pursuant to a warrant, an appellate court inquires 'whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' [Citations.] 'The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the

24.

circumstances set forth in the affidavit before him [or her], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" (*People v. Carrington* (2009) 47 Cal.4th 145, 161.)

"In reviewing the trial court's suppression ruling, we defer to its factual findings if supported by substantial evidence.  We independently assess the legal question of whether the challenged search or seizure satisfies the Fourth Amendment."  (*People v. Brown* (2015) 61 Cal.4th 968, 975.)  We review challenges to the admissibility of evidence obtained by a police search and seizure under federal constitutional standards. (*People v. Lomax* (2010) 49 Cal.4th 530, 564, fn. 11.)

We thus turn to defendant's contentions regarding the particularity and breadth of the warrant, and whether it amounted to an unconstitutional "general warrant."

### A.  The scope of the warrant

"In order for a search to be reasonable, the warrant must be specific.  [Citation.] Specificity has two aspects:  particularity and breadth.  [¶]  Particularity is the requirement that the warrant must clearly state what is sought.  [Citation.]  Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based."  (*In re Grand Jury Subpoenas Dated Dec. 10, 1987* (9th Cir. 1991) 926 F.2d 847, 856–857; accord, *People v. Ulloa* (2002) 101 Cal.App.4th 1000, 1004 (*Ulloa*).)

### *Particularity*

As to particularity, "'[i]t is familiar history that indiscriminate searches and seizures conducted under the authority of "general warrants" were the immediate evils that motivated the framing and adoption of the Fourth Amendment.' [Citation.]  The particularity requirement of the Fourth Amendment helps to ensure that a search or seizure 'will not take on the character of the wide-ranging exploratory searches [or seizures] the Framers intended to prohibit.'"  (*People v. Robinson* (2010) 47 Cal.4th

25.

1104, 1132; accord, *People v. Scott* (2011) 52 Cal.4th 452, 486; see *Andresen v. Maryland* (1976) 427 U.S. 463, 480; *Maryland v. Garrison* (1987) 480 U.S. 79, 84.)

"However, a warrant 'need only be reasonably specific' [citation], and 'the specificity required "varies depending on the circumstances of the case and the type of items involved."' [Citations.] The constitutional and statutory requirements of particularity are satisfied if the warrant 'imposes a meaningful restriction upon the objects to be seized.' [Citation.] The requirement of reasonable particularity 'is a flexible concept, reflecting the degree of detail available from the facts known to the affiant and presented to the issuing magistrate.'" (*People v. Robinson*, *supra*, 47 Cal.4th at p. 1132.)

"'[T]he requirement that a search warrant describe its objects with particularity is a standard of "practical accuracy" rather than a hypertechnical one.' [Citations.] The rule against excessive parsing of the language used in a warrant (while retaining the rule that items to be seized be identified in a warrant with constitutionally required specificity, so that the police do not engage in unfettered rummaging through a person's effects) militates in favor of truthfinding in criminal investigations, a value of significant importance to the public safety and societal order." (*People v. Superior Court* (*Nasmeh*) (2007) 151 Cal.App.4th 85, 96.)

"Whether a warrant's description of property to be seized is sufficiently particular is a question of law subject to independent review by an appellate court. [Citation.] In considering whether a warrant is sufficiently particular, courts consider the purpose of the warrant, the nature of the items sought, and 'the total circumstances surrounding the case.'" (*People v. Eubanks* (2011) 53 Cal.4th 110, 133.)

### ***Breadth***

"[T]he concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant." (*In re Grand Jury Subpoenas Dated Dec. 10, 1987*, *supra*, 926 F.2d at p. 857.) The breadth requirement

"ties the probable cause stated in the affidavit to the items seized." (*Ulloa*, *supra*, 101 Cal.App.4th at p. 1005.)

"The scope of the warrant, and the search, is limited by the extent of the probable cause. [Citations.] We have pointed out that probable cause must exist to seize all the items of a particular type described in the warrant. [Citation.] Like the particularity requirement, this requirement prevents a 'general, exploratory rummaging in a person's belongings.'" (*In re Grand Jury Subpoenas Dated Dec. 10, 1987*, *supra*, 926 F.2d at p. 857.)

"A warrant that permits a search broad in scope may be appropriate under some circumstances, and the warrant's language must be read in context and with common sense." (*People v. Eubanks*, *supra*, 53 Cal.4th at pp. 134.)

"When determining whether a warrant which authorizes the seizure of a category of items is overbroad, we consider: (1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available to it at the time the warrant issued." (*United States v. Shi* (9th Cir. 2008) 525 F.3d 709, 731–732; accord, *United States v. Flores* (9th Cir. 2015) 802 F.3d 1028, 1044.)

### *Ulloa*

In *Ulloa*, the court addressed both particularity and breadth in a search warrant used to seize the defendant's home computer. Defendant was charged with committing multiple acts of oral copulation and sodomy against a minor, and convicted of one count of oral copulation. The prosecution obtained a warrant to search defendant's home and any computers for evidence about the exploitation of children, including videos and/or photographs depicting actual or simulated sexual acts. The officer's supporting affidavit stated defendant had communicated with the minor through America Online's instant

27.

messaging service (AOL). The police seized defendant's home computer and found it contained AOL instant messages between defendant and the minor, along with miscellaneous photographs that did not involve the victim. At trial, the prosecution introduced the messages, but not the photographs. Defendant argued the warrant constituted an illegal and overbroad "general warrant" to search for any incriminating messages, videos, or photographs, instead of a specific limited search. (*Ulloa*, *supra*, 101 Cal.App.4th at pp. 1004–1006.)

*Ulloa* held the warrant satisfied the particularity requirement because the warrant sufficiently described the items to be seized, and the descriptions were sufficiently detailed for the officers to search for and seize depictions of actual or simulated sexual acts. (*Ulloa*, *supra*, 101 Cal.App.4th at p. 1005.) However, the court was concerned about whether the warrant was overbroad because it sought evidence that had nothing to do with the charged offenses. (*Ibid.*)

Ulloa held that even assuming that photographs were seized pursuant to portions of the warrant that were overbroad, the photographs were not introduced at trial. (*Ulloa*, *supra*, 101 Cal.App.4th at pp. 1005–1006.)

> "The only records derived from the search that were admitted at trial were transcripts of the AOL instant messages taken from [the] defendant's home computer. The affidavit for the search warrant states that the officers had been told that [the] defendant had been communicating with the minor through AOL's instant messaging service. The officers and the trial court could reasonably conclude that examination of [the] defendant's computer would either confirm or dispel the allegations of a relationship between [the] defendant and the minor. The seizure of all computers at [the] defendant's home was thus likely to produce relevant information." (*Ulloa*, *supra*, 101 Cal.App.4th at p. 1006.)

*Ulloa* concluded defendant's particularity and overbreadth objections "were directed at categories of potential evidence which were not used at trial. The only evidence used at trial was the AOL instant messages, and that evidence was properly

authorized to be seized by the search warrant." (*Ulloa*, *supra*, 101 Cal.App.4th at pp. 1006–1007.)

*Ulloa* also addressed defendant's related argument that the warrant was invalid because the affidavit did not establish probable cause to believe he had a home computer that contained incriminating evidence. (*Ulloa*, *supra*, 101 Cal.App.4th at p. 1007.) *Ulloa* held the seizure of the computer was supported by probable cause because home computers were common, the officers had specific information that the defendant communicated with the minor by computer, it was "reasonable to assume that the computer would contain relevant incriminating information, and that the computer would be located in [the] defendant's home[,]" and there was "a fair probability" that evidence of a crime would be found in the defendant's computer. (*Id.* at pp. 1007, 1008.)

**B.      The scope of the Facebook warrant was supported by probable cause**

Defendant notes the Facebook warrant issued in this case sought three categories of evidence for the "Korajus Green" account: (1) "Subscriber Information," (2) "I.P. Logs," and (3) "Stored User Files." Defendant concedes the affidavit stated probable cause for subscriber information and the messages between K.H. and "Green." However, defendant argues the warrant failed to describe the evidence sought with particularity because it should have been limited only to the actual messages between "Green" and K.H., without disclosing any additional information obtained from the "Green" account. Defendant further argues the warrant was overbroad because it sought all account information in the second and third categories without limitation, and was not supported by probable cause.

Based on the nature and circumstances of this case, however, the Facebook warrant was "commensurate with the scope of the investigation." (*People v. Kraft* (2000) 23 Cal.4th 978, 1043.) K.H. reported the April 2017 assaults, but defendant was not immediately arrested. While defendant was still at large and the restraining order was in effect, K.H. reported to law enforcement that defendant contacted her through a

29.

Facebook account under the name of "Korajus Green" and provided screenshots of some of "Green's" messages.

Walden's affidavit described the April 2017 domestic violence incidents, the existence of the restraining order, and K.H.'s disclosure that defendant contacted her using a Facebook account in another person's name. While defendant asserts the warrant should have been limited to confirming the existence of these same messages on "Green's" Facebook account, there is no evidence that law enforcement had the entirety of the messages exchanged between "Green" and K.H. during the relevant time period.

Given these circumstances, the warrant satisfied both the particularity and breadth requirements based on the declarations in Walden's affidavit. The affidavit established probable cause that defendant used the "Green" account to contact K.H. in violation of an existing restraining order after he assaulted her. The warrant properly sought all information about the "Green" account that could either confirm or refute K.H.'s belief that defendant was the person who was sending her messages using "Green's" account. This information properly included the subscriber information about whoever created "Green's" account to determine whether defendant or someone else had access to it, the I.P. logs to show all contacts between "Green" and third parties, the dates for the messages, photographs, or videos on the account to determine if they were sent in violation of the existing restraining order, the stored user files to locate all possible messages during the relevant time period between "Green" and K.H., even those that may have been deleted, and also determine if defendant was using the "Green" account to contact K.H.

Based on the declarations in the affidavit, the Facebook warrant was not an unconstitutional "general warrant" to inspect the electronic records, but instead focused on obtaining evidence to determine whether defendant controlled, operated, used and/or directed another person to use the "Green" account to send messages to K.H. in violation of the restraining order, or refute K.H.'s belief that defendant sent her the messages.

30.

Nevertheless, defendant argues all of the evidence obtained from the Facebook warrant should have been suppressed since most of the warrant was overbroad. If some portion of a warrant is found to be overbroad, "the valid portions of a search warrant may be severed from the invalid portions and the search made pursuant to the valid portions upheld. [Citation.] But severance is not available when the valid portion of the warrant is 'a relatively insignificant part' of an otherwise invalid search." (*In re Grand Jury Subpoenas Dated Dec. 10, 1987*, *supra*, 926 F.2d at p. 858.) The doctrine of severance "'allows a court to strike from a warrant those portions that are invalid and preserve those portions that satisfy the [F]ourth [A]mendment.… We have previously allowed severance when a warrant lacked particularity because of some unduly broad language in the warrant.' [Citation.] 'Total suppression, on the other hand, is appropriate when a warrant is wholly lacking in particularity.' [Citation.] [¶] In general, we do not allow severance or partial suppression 'when the valid portion of the warrant is a relatively insignificant part of an otherwise invalid search.'" (*United States v. SDI Future Health, Inc*. (9th Cir. 2009) 568 F.3d 684, 707.)

Defendant argues severance is not appropriate because the messages between K.H. and "Green" were only a small portion of the evidence obtained from the warrant, even though they were supported by probable cause. Defendant argues all of the Facebook evidence should have been suppressed because the overwhelming amount of evidence obtained from the warrant was based on the overbroad portions for seizure of the I.P. logs and stored user files. Defendant asserts the court's denial of his suppression motion was prejudicial and requires reversal of count 6 because the Facebook messages were the basis for his conviction for felony dissuading a witness in violation of section 136.1, subdivision (b)(2).

We reject defendant's assertion that the entirety of the Facebook evidence should have been excluded, including the evidence that he concedes was supported by probable cause. As in *Ulloa*, defendant's particularity and overbreadth objections are directed "at

31.

categories of potential evidence which were not used at trial." (*Ulloa*, *supra*, 101 Cal.App.4th at pp. 1006–1007.)  The court heard defendant's suppression motion after the People had rested.  The Facebook evidence was limited to the messages between "Green" and K.H.  As defendant concedes, there was probable cause to support the warrant's seizure of the messages where defendant repeatedly contacted K.H.  However, the "[The d]efendant has not identified any item seized under any of these other provisions that was admitted at trial.  Accordingly, even if we assume some provision of the warrant was overbroad, [the] defendant has not shown that any evidence should have been suppressed." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1043–1044.)[15]

## II.     The court's authorization of funds for the defense experts

Defendant's next issue involves the court's orders in response to his applications for appointment of a defense expert.  Defendant initially filed an application to appoint Victor VeVea as an expert to review the Facebook evidence.  The court granted the motion, but reduced the amount that defense counsel requested to pay VeVea.  VeVea declined to take the case under the reduced payment.

Defendant then filed another application for funds to instead retain Neil Broom as an expert on the same issue.  The court granted the request for the full amount requested for Broom.  In the midst of trial, defendant filed a motion for additional funds for Broom, and the court approved the bulk of the request.  When the defense case began, however, defense counsel called VeVea as an expert instead of Broom and said that Broom did not "produce all of … what we anticipated," without further explanation.

On appeal, defendant contends the court violated his right to prepare and present a defense when it granted his first motion to appoint VeVea as an expert, but limited the amount that he would be paid.  Defendant asserts the court's subsequent appointment of

---

[15]     Given our conclusion, we need not reach the alternative argument as to whether the good faith exception applies pursuant to *United States v. Leon* (1984) 468 U.S. 897.

Broom did not cure the harm because it required him to call VeVea at the last minute with little time to review the Facebook evidence.

We will review defendant's right to ancillary services and the procedural history behind the court's orders, and find the court did not abuse its discretion under the facts and circumstances of this case.

A.    **An indigent defendant's right to ancillary services**

A defendant has a constitutional and statutory right to ancillary services necessary to present a defense, and that includes expert witnesses. (*Ake v. Oklahoma* (1985) 470 U.S. 68, 76–77; *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319 (*Corenevsky*); Evid. Code, § 730.)

Evidence Code section 730 addresses the appointment of experts in noncapital cases. (*People v. Stuckey* (2009) 175 Cal.App.4th 898, 908.) It states in pertinent part:

> "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. The court may fix the compensation for these services, if any, rendered by any person appointed under this section, in addition to any service as a witness, at the amount as seems reasonable to the court." (Evid. Code, § 730.)

"The defendant has the burden of demonstrating the need for the requested services. [Citation.] The trial court should view a motion for assistance with considerable liberality, but it should also order the requested services only upon a showing they are reasonably necessary." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1085, overruled on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151; accord, *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 286; *Corenevsky*, *supra*, 36 Cal.3d at pp. 319, 321.) The defendant must demonstrate "the need for such services by

reference to "'the general lines of inquiry he wishes to pursue, being as specific as possible.'"" (*Corenevsky*, *supra*, at p. 320.)

While the defendant has the right to obtain funds for ancillary services, he or she does not have a constitutional right to choose an expert of his or her choice. (*Ake v. Oklahoma*, *supra*, 470 U.S. at p. 83.)

On appeal, a trial court's order on a motion for ancillary services is reviewed for abuse of discretion. (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1085; *People v. Clark* (2016) 63 Cal.4th 522, 630–631; *Corenevsky*, *supra*, 36 Cal.3d at pp. 319, 321.)

With this background in mind, we turn to the procedural history of defendant's motions for expert funds.

## B. Defendant's motion for appointment of VeVea

On October 3, 2017, defendant filed a confidential ex parte application for the court to appoint Victor VeVea as a Facebook and technology expert.[16]

Defense counsel declared that on September 27, 2017, the district attorney provided the defense with a PDF file consisting of 1,738 pages from the Facebook warrant, and an additional 318 files in hypertext markup language and related support files. Defense counsel declared he needed an expert to review and report on the files so that he could review the material with defendant, and prepare the appropriate pleadings and motions for trial, and the expert would likely testify at trial. Counsel further declared VeVea, an attorney, "is such an expert, and is an author of the *Criminal Defense Guide to Facebook*."

Counsel declared that appointing VeVea as the defense expert would result "in a significant savings to the County in that this expert charges significantly less than other computer experts, and he is in Bakersfield[,]" and he had been appointed by the superior

---

**16** All of defendant's applications for funds for the experts were entitled "confidential," but were not filed or transmitted to this court under seal, and are part of this court's appellate record.

courts in both Kern and Tulare counties "many times in the past with good affect, including multiple murder cases and complex death penalty cases."

Defense counsel requested a funding authorization for VeVea of up to $1,200, based on VeVea's estimate that he would need 10 hours to prepare at $100 per hour. VeVea's resume was not attached to the motion.

### C.   The court appoints VeVea

On October 10, 2017, the court issued an order that appointed VeVea as a defense expert to "only review Facebook files and put in format accessible by counsel."  While defendant's motion requested $1,200 based on VeVea's fee of $100 per hour, the court only authorized a total of $400 based on $40 per hour.  However, the court's order also stated:  "If additional funds are necessary further requests can be made."[17]

Defendant did not make any additional requests for funds for VeVea.

### D.   Defendant's ex parte motion for appointment of Broom

On October 12, 2017, defendant's trial began with the court hearing the parties' motions in limine.

On October 13, 2017, defendant filed a confidential ex parte application for appointment of Neil Broom as a Facebook and technology expert in place of VeVea.  In his supporting declaration, defense counsel complained about the court's decision to limit the funds to retain VeVea as the expert:

> "On October 3, 2017, I requested appointment of Victor VeVea, Facebook expert and author of multiple books, including *Criminal Defense Guide to Facebook*.  Mr. VeVea appears to be not only the most economical expert, but also the most qualified in this area, and he has assisted me and multiple other attorneys on many cases in the past.  [¶]  On October 12, 2017, the Court returned an endorsed appointment order declining the requested appointment but instead appointing Mr. VeVea at $40 per hour, less than half his regular rate for such services.  The

---

**17**     As we have explained, defendant's appellate claim of error is based on the court's order of October 10, 2017, that appointed VeVea but reduced his requested fee.

estimated hours were reduced from twelve to ten, thereby authorizing $400 for his expert services.  Mr. VeVea has declined the reduced rate and reduced hours.  I am, therefore, left without an expert."

Defense counsel requested appointment of Broom as the new defense expert on the Facebook evidence and other technology issues, and stated he was on "the approved list of experts for Los Angeles Superior Court[,]" and attached his resume.  Counsel requested a funding authorization of $4,000, based on Broom's estimate that he would need 16 hours to prepare at a rate of $250 per hour, which included his travel expenses to appear at trial.  Broom would be available to appear after October 20, 2017.

According to Broom's attached resume, he was the president and director of the Technical Resource Center in Huntington Beach, and acted as an expert witness, investigator, and consultant in the fields of computer forensics, network and computer security.  He had over 25 years of experience "providing investigative, technical, educational, and security services to the military, attorneys, law enforcement, the health care industry, financial institutions, and government agencies[,]" and he was a qualified expert witness in federal and state courts and has been appointed to the Los Angeles Superior Court panel of expert witnesses in computer forensics.

### E.     The court's appointment of Broom

On October 13, 2017, the court appointed Broom "to assist the Defense" and authorized the full amount requested of $4,000.

### F.     Defendant's ex parte application for additional funds for Broom

On October 17, 2017, the parties gave their opening statements and the People began the introduction of evidence.

On October 23, 2017, defendant filed another confidential ex parte application and requested additional funds for Broom.  In his supporting declaration, defense counsel again complained about the court's previous order that did not grant the entirety of VeVea's requested funds, and stated that ruling required counsel to instead retain Broom.

Defense counsel declared the court previously appointed Broom at the rate of $250 per hour with a total authorization of $4,000, but Broom had exceeded this amount. Counsel requested an additional authorization up to $3,000, based on 12 hours at $250 per hour. In further support of the request, counsel attached a note from Broom that stated additional funds were needed to review the electronic evidence, and "verify and cross-reference all of the Facebook information with the phone."

### G. The court's order

On October 23, 2017, the People rested subject to moving exhibits into evidence. On the same date, the court conducted an in camera hearing outside the jury's presence on defendant's request for additional funds for Broom.[18]

After the in camera hearing, the court issued an order that authorized an additional $2,000 for Broom's work.

### H. VeVea's trial appearance

At the beginning of the trial proceedings on October 24, 2017, defense counsel advised the court that he would be calling VeVea as the expert instead of Broom. Defense counsel did not file a motion for funds for VeVea or explain why he switched experts.

VeVea testified as set forth above. During cross-examination, VeVea testified he did not review "every piece" of data because "there was a lot of it and I started early this morning …."

During a break in the prosecutor's cross-examination of VeVea, defense counsel addressed the court outside the jury's presence, and asked to place their prior conversation on the record:

---

[18]   In contrast to defendant's "confidential" applications that were not filed under seal, the court held the hearing on defendant's request for additional funds for Broom in camera and ordered the transcript sealed.

"That because of the references to things being done at the last minute, in fact, on the very day of testimony, put in the record that we had this expert ex parte for Mr. VeVea, that we anticipated that he would be appointed the expert, and that was essentially denied at the last minute by the Court, *and so we had to get another expert who didn't produce all of the—what we anticipated*, and so we called Mr. VeVea who is not getting paid by the Court, but he's had to do all these things at the last … minute, and so that's why there's been some delay and, I suppose, some inconvenience to [the prosecutor] and the Court, but I just wanted to put that on the record it's ever a—" (Italics added.)

The court interrupted and said:

"The ex parte request for fees for this particular witness was denied several weeks ago. At the start of the trial I received [a] request for payment of a different expert witness because this witness wouldn't be available, at least for the start of the trial, and that witness we had the ex parte on yesterday, and now we're back to this particular witness, so I think we've got a record on the status of that."[19]

## I.    Analysis

Defendant argues that while the court granted his motion to appoint VeVea as the defense expert, it abused its discretion because it substantially reduced the requested funds and hourly rate of pay. Defendant asserts the court's decision was prejudicial because it resulted in VeVea declining the appointment as the defense expert, and required defendant to retain him at the last minute to testify.

Defendant argues that if the court had granted his original request to appoint VeVea and pay the entirety of his requested fee, a more favorable result would have occurred. Defendant concedes he never claimed the Facebook evidence was "purposefully falsified," but asserts the records were "problematic at best[]" and VeVea's testimony "was not fully developed due to lack of time to prepare." "Had the initial order

---

**19**    On the same day, defendant filed a motion for sanctions to exclude the entirety of the Facebook evidence and alleged the People had requested altered records from Facebook that changed the dates on the messages. At a hearing on the motion, the prosecutor replied the motion was frivolous, the evidence was downloaded from a computer, and there was nothing to show the People or law enforcement altered or changed any data. The court denied defendant's motion.

not prevented VeVea from serving as defense counsel's expert, it cannot be established beyond a reasonable doubt that his testimony would have changed the jury's verdict" as to count 6, dissuading a witness.

Defendant further asserts the court's subsequent appointment of Broom at the full rate of his requested fee did not cure the earlier alleged error because "Broom was unable to perform the services needed by defense counsel thereby requiring VeVea to testify on short notice."

There are several problems with defendant's arguments. First, defendant had the burden of demonstrating that VeVea's services as an expert were reasonably necessary "by reference to "'the general lines of inquiry he wishes to pursue, being as specific as possible.""" (*Corenevsky*, *supra*, 36 Cal.3d at p. 320.) In his motion to appoint VeVea, defense counsel asserted he needed VeVea's expertise to review and report to counsel about the Facebook warrant, and cited his authorship of a book about Facebook evidence and that he previously testified as an expert on this topic. Counsel also touted the "significant savings" that would result from VeVea's appointment since he was from Bakersfield, but did not offer a detailed explanation about why it was reasonably necessary for VeVea to be paid for the number of hours requested.

While the court limited the initial amount for VeVea, it also stated that further requests could be made if additional funds were necessary. VeVea declined the appointment because of the court's decision not to fully grant his funding request. Defendant did not file an application for additional fees or offer a more detailed explanation about why VeVea needed a certain amount of time that was reasonably necessary to the defense.

When VeVea declined the appointment, defendant filed another motion for appointment of Broom. The court granted this motion for the full amount requested of $4,000, and an additional request for $2,000. Defendant never advised the court of any problems with Broom. When it was time for the defense expert to appear, however,

39.

counsel called VeVea without filing a new request for his appointment. Counsel's only explanation was that when VeVea declined to work for the reduced amount, "*we had to get another expert who didn't produce all of the—what we anticipated*, and so we called Mr. VeVea who is not getting paid by the Court, but he's had to do all these things at the … very last minute .…" (Italics added.)

In this appeal, defendant has not cited to anything in the record to explain the belated decision to call VeVea instead of Broom, even though Broom was a qualified expert and the court granted the majority of his fee request, except to repeat the reason given at trial that "Broom was unable to perform the services needed by defense counsel thereby requiring VeVea to testify on short notice."

While a defendant has the right to obtain funds for ancillary services, he or she does not have a constitutional right to an expert of his or her choice. (*Ake v. Oklahoma*, *supra*, 470 U.S. at p. 83.) The court did not abuse its discretion when it limited defendant's initial and only request for funds to retain VeVea since defendant did not file a renewed motion for additional funds with a more detailed explanation to support his appointment, the court granted his request to appoint Broom at his full rate and a second request for additional funds, and Broom appeared to be a qualified expert to address the Facebook evidence. Defendant was entitled to the assistance of an expert, but not to the expert of his choice.

## III.    Imposition of consecutive sentences

Defendant asserts the court improperly imposed upper and consecutive terms without stating specific reasons for the decision. Defendant asserts the circumstances of the offenses were not sufficiently independent to justify consecutive sentences, and the probation report's recommendations were based on information in police reports and not on the trial testimony.

## A.     The probation report

The probation report recommended an aggregate sentence of nine years.  The report found no mitigating circumstances, and aggravating circumstances that his prior convictions as an adult and juvenile petitions were numerous, and he was on misdemeanor and felony probation when he committed the current offenses.  Defendant was statutorily ineligible for probation based on the deadly weapon enhancement, and the report stated he was not a suitable candidate for probation because of his failure to comply with prior grants of probation, the nature of the current convictions, and concerns about the victim's safety.

The probation report recommended imposition of the upper term for count 1, willful infliction of corporal injury on April 26, 2017, based on the aggravating circumstances.  The report also recommended consecutive sentences for count 3, willful infliction of corporal injury on April 27, 2017; count 5, willful infliction of corporal injury between January 1 and April 26, 2017; and count 6, dissuading a witness between May 3 and June 12, 2017, because the crimes and their objectives were predominantly independent of each other, the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior, and the crimes involved separate acts of violence or threats of violence.

## B.     The sentencing hearing

On November 28, 2017, the court conducted the sentencing hearing.  K.H. addressed the court and said it wasn't fair to sentence defendant to prison because she lied about what happened and there were no witnesses who saw anything.  K.H. said she was homeless and had nowhere to go with her children.  K.H. also complained that she and the children were prevented from contacting defendant because of the restraining order from the Los Angeles County case.  The court replied that it could not modify the Los Angeles County order.

41.

The court said it had presided over defendant's trial, and it was going to follow the probation report's recommendation for an aggregate term of nine years because the sentence was justified by the facts of the case. The prosecutor requested the court to impose additional, consecutive terms for a total of 12 years. The court declined the request. The court stated defendant had "a significant history" of violating restraining orders and violence, but this was defendant's first significant prison commitment and nine years was more appropriate. The court was "always hopeful that human behavior will change. Most of the time the court is often disappointed in the lack of success that we have in these matters, but I'm not inclined to aggravate the sentence beyond what has been recommended by Probation."

The court found defendant was statutorily ineligible for probation based on the deadly weapon enhancement, there were no unusual circumstances, and he was not otherwise qualified for probation based on his criminal history and the lengthy ongoing offenses of victimizing K.H., who was the mother of his children.

The court turned to the aggravating circumstances;

> "The Court believes that the factors and circumstance in aggravation as set forth by the Probation Department; that is, his prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous, and that he was on misdemeanor and felony probation when the crime was committed, and at least in this county … one of those probations, I believe, was for the same offense and from L.A. County the same type of offense as well. [¶] As such, the Court will adopt the upper terms and the Court will follow the Probation Department's recommendation regarding enhancements as running consecutive versus the running concurrent."

The court imposed an aggregate term of nine years based on the upper term of four years for count 1, willful infliction of corporal injury on April 26, 2017, plus a consecutive term of one year for the deadly weapon enhancement; a consecutive term of one year for count 3 (one-third the midterm), willful infliction of corporal injury on April 27, 2017; another consecutive term of one year for count 5 (one-third the midterm),

willful infliction of corporal injury between January 1 and April 26, 2017; a fully consecutive midterm of two years for count 6, dissuading a witness between May 3 and June 12, 2017; and a concurrent term of 180 days for misdemeanor count 9. The court stayed the terms imposed for counts 4, 7, and 8 pursuant to section 654.

After the court imposed sentence, K.H. again addressed the court because she did not want the restraining order to remain in effect and wanted to have contact with defendant. The court advised K.H. that she placed herself and the children in danger by having contact with defendant, and that it would continue the order for the children's safety. However, the court modified the existing restraining order to permit electronic, telephonic, or written contact with defendant, and prohibited in-person contact by K.H. and the children for one year subject to any family court visitation orders. "So if you want to have visitation, go to family court, get a family court order."

### C.  Analysis

Defendant asserts the court improperly imposed upper and consecutive sentences without stating specific reasons for the decision. Defendant further argues the court failed to consider that all the convictions were based on the same victim, committed in the same place and close in time, occurred because defendant believed the victim was lying about her own prior behavior and whether she had cheated on him, and the victim wanted defendant to receive treatment for his alcohol and drug problems.

Defendant has not argued that the court imposed an unauthorized sentence that is subject to correction at any time. (See, e.g., *People v. Rivera* (2019) 7 Cal.5th 306, 348.) Instead, he asserts the court abused its discretion when it selected the upper and consecutive terms without stating specific reasons for its sentencing choices. Defendant did not object to the court's exercise of its sentencing discretion and has thus forfeited appellate review of these issues. (*People v. Scott* (1994) 9 Cal.4th 331, 354–356; *People v. Boyce* (2014) 59 Cal.4th 672, 730–731.) "Had [the defendant] timely and specifically objected below, the trial court presumably would have had an opportunity to correct, and

43.

could have corrected, any error." (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1372, fn. omitted.)

Defendant concedes he did not object at the sentencing hearing, and he has not raised ineffective assistance as an alternative argument. Instead, defendant urges this court to address the merits because it has "inherent power" to do so pursuant to *People v. Williams* (1988) 17 Cal.4th 148. *Williams* does not support defendant's position because it involved a People's appeal from the trial court's decision to dismiss a prior strike conviction and not impose a third strike term. *Williams* held the trial court's decision was legally erroneous and remanded the matter for resentencing. In doing so, *Williams* reaffirmed that a party forfeits appellate review under *Scott* by failing to object to the court's discretionary sentencing decisions. *Williams* further held that a reviewing court has the ability and "authority" to review the trial court's sentencing decisions in certain circumstances, regardless of whether a party has objected. (*Id.* at p. 161, fn. 6.)

Defendant next points to *People v. Sperling* (2017) 12 Cal.App.5th 1094 as an example where the court addressed the merits of a discretionary sentencing decision even though the defendant failed to object. In *Sperling*, the defendant failed to object at the sentencing hearing and the court similarly held the defendant forfeited his sentencing challenges on appeal. *Sperling* further held that even if the defendant had preserved review, the trial court did not abuse its discretion when it imposed the sentence. (*Id.* at pp. 1101–1104.)

In this case, even if we were to address defendant's sentencing contentions, his arguments are meritless. The judge in this case had presided over defendant's jury trial and was familiar with the facts and circumstances of defendant's convictions, aside from the probation report's summary. The court was also aware of K.H.'s attempts to minimize defendant's assaults against her, and defendant's efforts to dissuade K.H. from testifying against him. Indeed, K.H. appeared at the sentencing hearing, asked the court

not to send him to prison and to withdraw the restraining order, and claimed she had lied about everything.

Only a single aggravating factor is required to support the court's selection of an upper term and, similarly, only one factor in aggravation is required to support a consecutive sentence. However, the court may not rely on the same fact to impose both an upper term and a consecutive sentence. (*People v. Sperling*, *supra*, 12 Cal.App.5th at pp. 1103–1104; *People v. King* (2010) 183 Cal.App.4th 1281, 1323–1324; *People v. Ortiz*, *supra*, 208 Cal.App.4th at p. 1371; *People v. Leon* (2010) 181 Cal.App.4th 452, 468–469; *People v. Osband* (1996) 13 Cal.4th 622, 728–729; Cal. Rules of Court, rule 4.425(b)(1).) We review the court's decision to impose both an upper term and a consecutive sentence for an abuse of discretion. The court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; *People v. Sperling*, *supra*, 12 Cal.App.5th at pp. 1102–1104.)

"Where sentencing error involves the failure to state reasons for making a particular sentencing choice, … reviewing courts have consistently declined to remand cases where doing so would be an idle act that exalts form over substance because it is not reasonably probable the court would impose a different sentence." (*People v. Coelho* (2001) 89 Cal.App.4th 861, 889; accord, *People v. Gutierrez* (1991) 227 Cal.App.3d 1634, 1638.)

The court found the upper term was appropriate for count 1, and consecutive terms should be imposed for counts 3, 5, and 6. The court also agreed with the probation report's finding of aggravating circumstances, that his prior convictions as an adult and juvenile petitions were numerous, he was on misdemeanor and felony probation when the crime was committed, and at least one of those probationary orders was for the same type of offense in Los Angeles County. While all the convictions involved the same victim, the counts were based on separate incidents on different days.

To the extent the court did not clarify its reasons, it did not abuse its discretion when it imposed the upper and consecutive terms because it agreed with the probation report's finding of two separate aggravating factors that supported its sentencing decisions in this case:  one factor supported the upper term for count 1, and the other factor supported the decision to impose consecutive sentences.  As a result, remand would be an idle act.

## **DISPOSITION**

The judgment is affirmed.

MEEHAN, J.

WE CONCUR:

POOCHIGIAN, Acting P.J.

SMITH, J.

46.